IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

FREDERICK POLION,                    )
                                     )
        Petitioner,                  )
                                     )
v.                                   ) CIVIL ACTION NO. 00-B-2313-W
                                     )
MIKE HALEY, Commissioner of the Alabama )
Department of Corrections;           )
ATTORNEY GENERAL                     )
FOR THE STATE OF ALABAMA,            )
                                     )
        Respondents.                 )

**ENTERED**

SEP 22 2003

### MEMORANDUM OF OPINION

Frederick Polion, hereinafter referred to as petitioner, filed this petition for writ of habeas

corpus pursuant to 28 U.S.C. § 2254. Polion is represented by retained counsel. On January 28, 1998,

petitioner was convicted in the Circuit Court of Tuscaloosa County, Alabama of first degree kidnapping,

and he was sentenced to 20 years imprisonment. The Alabama Court of Criminal Appeals affirmed

petitioner's conviction on September 10, 1999, and denied the motion for rehearing on October 8, 1999.

The Alabama Supreme Court initially granted the petition for writ of certiorari on February 9, 2000, but

ultimately quashed the writ on May 12, 2000. Petitioner subsequently filed this federal habeas petition

raising various claims of ineffective assistance of pretrial and trial counsel.

The claims raised in this federal petition for writ of habeas corpus were raised in the trial court

in a motion for new trial and during the appeal proceedings.

An Order to Show Cause was entered which required respondents to appear and show cause why

the relief requested by petitioner should not be granted. Respondents have filed an Answer and exhibits.

The court entered an Order advising petitioner that respondents' Answer would be considered as a motion



for summary judgment. The Order afforded petitioner an opportunity to file affidavits or other material

in opposition to the motion and advising him of the consequences of default.

The Alabama Court of Criminal Appeals gave the following synopsis of facts:

> Polion's conviction stems from his actions in assisting his
> girlfriend, Felicia Scott following the murder of Carethia
> Curry. The evidence tended to show that seventeen-year-
> old Curry, who was nine months' pregnant, was murdered
> on or about January 31, 1996. Forensic examinations
> suggest that Curry was alive when her unborn child was
> cut from her womb. Scott was convicted of Curry's
> murder, made capital because it occurred during a
> kidnapping in the first degree, and Polion was convicted
> of first degree kidnapping of the baby.[1]

(Exhibit D).

Limited reference to additional facts are useful in understanding the issues. Scott had told Polion

that she was pregnant with his child. (R.1463). Although Scott did not appear to be pregnant, Polion

testified that he believed her when she said she was pregnant. (R.1469-70). A former boyfriend of Scott

testified that he had been duped in 1991 or 1992 by Scott who told him that she was pregnant. (R.1433-

---

[1]    Petitioner was indicted on two counts of capital murder:

### COUNT 1

FREDERICK POLION ... did intentionally cause the death of, Carethia Curry, by shooting her with a gun, and said defendant caused said death during said defendant's abduction of, or attempt to abduct Carethia Curry, with intent to inflict physical injury upon her and/or to accomplish or aid the commission of any felony, or flight therefrom, to-wit: Interference with Custody in violation of Section 13A-6-45 of the Code of Alabama, in violation of Section 13A-5-40(a)(1) of the Code of Alabama.

### COUNT 2

FREDERICK POLION ... did intentionally cause the death of, Carethia Curry, by shooting her with a gun, and said defendant caused said death during said defendant's abduction of, or attempt to abduct the unnamed infant child of Carethia Curry, with intent to inflict physical injury upon her and/or to accomplish or aid the commission of any felony, or flight therefrom, to-wit: Interference with Custody in violation of Section 13A-6-45 of the Code of Alabama, in violation of Section 13A-5-40(a)(1) of the Code of Alabama.

(R.14-16).

2

1440). Scott, in fact, was incapable of bearing children in 1996 because of an earlier hysterectomy. (R.1072, 1509). On January 31, 1996, at 6:00 p.m. Scott picked up Curry. (R.835-36). Scott also made several telephone calls to Polion and told him she [Scott] did not feel well and was going to the doctor. (R.1476-78). Polion left work and went to the local hospitals and made calls to hospitals in Birmingham in an effort to locate Ms. Scott. (R.1479-1484). Caroline O'Neal, Curry's mother, called Polion around 2:00 a.m. on February 1, 1996, to ask where her daughter and Scott were. (R-1485, 1541). Scott returned home after 5:00 a.m. covered in blood and with a baby. When Polion asked what had happened, Scott said, "Women bleed when they have children." (R-1489). Shortly thereafter Scott told petitioner that she shot Shell, her girlfriend from Montgomery (R-1494-95). Scott told Polion that she wanted to go to her sister's house in Birmingham. (R-1497). When they arrived at the sister's house, her sister asked Scott "Where is she?" and Scott replied "She's still in the trunk." (R-1498). The next day Polion helped Scott take a trash can away (R-1499). When they returned, he suspected that the trash can which was heavy, had contained a body because "all of the family was standing out in the yard like they were waiting to see exactly what happened." (R1502-03). When they returned to Tuscaloosa on Monday, February 5, 1996, the police arrived to question Scott about Curry (R-1506). Polion testified that despite all that had happened over the weekend, he did not realize the body in the trash can was Curry (R-1507). After the police left, Mr. Curry went to petitioner's house asking if he could talk to him (R-1508). Polion told him to bring the police back with him and they could talk. (R-1545). On Tuesday, February 6, 1996, Investigator Toni Everett called Polion. She told him that she had checked Scott's medical background and that Scott could not have children (R- 1509). He testified that he knew then that the body that was in the trash can was probably Curry's. (R-1511).

3

## APPLICABLE LAW

Title 28 U.S.C. § 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

> (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Title 28 U.S.C. § 2254(e)(1) provides:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

In *Washington v. Crosby*, 324 F.3d 1263 (11th Cir. 2003), (petition for certiorari filed June 18, 2003), the Eleventh Circuit Court of Appeals explained:

> A state court decision is "contrary to" the Supreme Court's clearly established precedent if (1) it applies a rule contradicting the governing law as set forth by Supreme Court case law, or (2) the state court, in a case with facts indistinguishable from those in a decision of the Supreme Court arrives at a different result. *Bottoson v. Moore*, 234 F.3d 526, 531 (11th Cir. 2000), *cert. denied*, 534 U.S. 956, 122 S.Ct. 357, 151 L.Ed. 2d 270 (2001). "A state court decision involves an unreasonable application of Supreme Court precedent "if the state court identifies the correct governing legal rule from [Supreme Court] cases but

4

> unreasonably applies it to the facts of the particular state prisoner's case.'" *Id.*, (quoting *Williams v. Taylor*, 529 U.S. 362, 407, 120 S.Ct. 1495, 1520, 146 L.Ed.2d 389 (2000)).  The Supreme Court cautioned that "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." *Williams*, 529 US. at 411, 120 S.Ct. at 1522.

324 F.3d at 1264.

The principles in *Strickland v. Washington,* 466 U.S. 668 (1984), govern all ineffective assistance of counsel claims.  The state court's decision was not "contrary to" clearly established federal law as determined by the United States Supreme Court because both the trial court and the Alabama Court of Criminal Appeals recognized that *Strickland* was the controlling law with respect to ineffective assistance of counsel claims, and there is no Supreme Court precedent that holds that it is ineffective assistance of counsel to advise a client to cooperate with police or that holds that it is ineffective assistance of counsel not to request any jury instructions or not to request specific jury instructions. See *Wellington v. Moore*, 314 F.3d 1256, 1260-61 (11th Cir. 2002).

At issue is whether the Alabama courts have unreasonably applied the test of *Strickland* to the facts of this case.  In *Strickland* the United States Supreme Court established a national standard for judging the effectiveness of criminal defense counsel.  "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result."  The Court elaborated:

> [F]irst, the defendant must show that counsel's performance was deficient.  This requires showing that counsel was not functioning as the "counsel" guaranteed

5

> the defendant by the Sixth Amendment.   Second, the
> defendant must show that the deficient performance
> prejudiced the defense.   This requires showing that
> counsel's errors were so serious as to deprive the
> defendants of a fair trial, a trial whose result is reliable.

466 U.S. 687

In reviewing the performance prong of *Strickland*, the court stated:

> In any case presenting an ineffectiveness claim, the
> performance inquiry must be whether counsel's assistance
> was reasonable considering all the circumstances.
> Prevailing norms of practice as reflected in American Bar
> Association standards and the like ... are guides to
> determining what is reasonable, but they are only guides.
> No particular set of detailed rules for counsel's conduct
> can satisfactorily take account of the variety of
> circumstances faced by defense counsel or the range of
> legitimate decisions regarding how best to represent a
> criminal defendant. Any such set of rules would interfere
> with the constitutionally protected independence of
> counsel and restrict the wide latitude counsel must have in
> making tactical decisions.

466 U.S. 688-89.

In *Crawford v. Head*, 311 F.3d 1288 (11th Cir. 2002), (petition for certiorari filed August 8, 2003)

the Eleventh Circuit Court of Appeals elaborated on the *Strickland* performance prong:

> [W]e must bear in mind that the "touchstone of a lawyer's
> performance under the Constitution" is "reasonableness."
> *Chandler [v. United States]*, 218 F.3d [1305] at 1319 [(11th
> Cir. 2000)].  As we have explained:
>
>> The test has nothing to do with what the best
>> lawyers would have done.  Nor is the test even
>> what most good lawyers would have done.  We ask
>> only whether some reasonable lawyer at the trial
>> could have acted, in the circumstances, as defense
>> counsel acted at trial... We are not interested in
>> grading lawyers' performances; we are not
>> interested in grading lawyers' performances; we

6

> are interested in whether the adversarial process at
> trial, in fact, worked adequately.

> *Waters [v. Thomas]*, 46 F.3d [1506] at 1512 [(11th Cir.
> 1996)](quoting *White v. Singletary*, 972 F.2d 1218, 1220-
> 21 (11th Cir. 1992)). Accordingly, "[t]he relevant question
> is not whether counsel's choices were strategic, but
> whether they were reasonable." *Putman [v. Head]*, 268
> F.3d [1223] at 1244 [(11th Cir. 2001)](quoting *Roe v.
> Flores-Ortega*, 528 U.S. 470, 481, 120 S.Ct. 1029, 1037,
> 145 L.Ed.2d 985 (2000). This recognizes that "[t]o uphold
> a lawyer's strategy, a court 'need not attempt to divine the
> lawyer's mental processes underlying the strategy,'" but
> instead must simply determine whether the course actually
> taken by counsel might have been reasonable. *Id.* (quoting
> *Chandler*, 218 F.3d at 1315 n.16).

311 F.3d at 1314.

In reviewing the prejudice prong, the United States Supreme Court in *Strickland* stated:

> It is not enough for the defendant to show that the errors
> had some conceivable effect on the outcome of the
> proceeding. Virtually every act or omission of counsel
> would meet that test, ... and not every error that
> conceivably could have influenced the outcome
> undermines the reliability of the result of the proceeding.

> ....

> The defendant must show that there is a reasonable
> probability that, but for counsel's unprofessional errors,
> the result of the proceeding would have been different. A
> reasonable probability is a probability sufficient to
> undermine confidence in the outcome.

> In making the determination whether the specified errors
> resulted in the required prejudice, a court should presume,
> absent challenge to the judgment on grounds of
> evidentiary insufficiency, that the judge or jury acted
> according to law. An assessment of the likelihood of a
> result more favorable to the defendant must exclude the
> possibility of arbitrariness, whimsy, caprice,
> "nullification," and the like. A defendant has no

7

entitlement to the luck of a lawless decisionmaker, even if a lawless decision cannot be reviewed. The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision. It should not depend on the idiosyncracies of the particular decisionmaker, such as unusual propensities toward harshness or leniency. Although these factors may have actually entered into counsel's selection of strategies and, to that limited extent, may thus affect the performance inquiry. Thus, evidence about the actual process of decision, if not part of the record of the proceeding under review, and evidence about, for example, a particular judge's sentencing practices, should not be considered in the prejudice determination.

The governing legal standard plays a critical role in defining the question to be asked in assessing the prejudice from counsel's errors. When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had reasonable doubt respecting guilt.

466 U.S. 693-95.

<u>THE 2254 CLAIMS</u>

I.   **Ineffective assistance of <u>pretrial</u> counsel when his attorney advised him to cooperate with law enforcement under the mistaken belief that there was a "deal"**

On appeal, the Alabama Court of Criminal Appeals held:

Polion argues he received ineffective assistance of pre-trial counsel because, he says, his pre-trial attorney, Ricky McKinney, advised him to cooperate with law enforcement. According to Polion, McKinney advised him to make a statement to law enforcement officers under the mistaken belief that the prosecutor had agreed to limit Polion's "exposure to hindering prosecution" in return for his cooperation in prosecuting co-defendants. At the hearing on Polion's motion for new trial, McKinney testified that he advised Polion to make a statement because he believed there was a deal between Polion and

8

the state. (R. 1793).  According to McKinney, numerous conversations occurred between himself, members of the district attorney's office and law enforcement officers. McKinney inquired about a possible misdemeanor plea. McKinney advised Polion to discuss possible options developed in these meetings with members of his family. McKinney also advised Polion that possible co-defendants might approach the state in an attempt to work out a deal that would adversely impact Polion.  We note that it appears from the record that McKinney was working to limit Polion's liability by trying to perfect a deal. McKinney further stated that he would not have recommended Polion cooperate if there was no agreement to limit Polion's liability.  (R. 1795).

Generally, mistakes made by counsel which are unfavorable to the defendant are not sufficient to establish ineffective assistance of counsel.  *Safford v. State*, 570 So.2d 727 (Ala. Cr. App. 1990).  The mere fact that counsel advises an accused to make a statement to law enforcement does not constitute inadequate representation as a matter of law.  *Phelps v. State*, 435 So.2d 745 (Ala.Cr.App. 1983).

While Polion's pre-trial counsel may have been operating under a mistake or misinterpretation of the statements by members of the district attorney's office or law enforcement, this alone will not satisfy the *Strickland* test. Thus, Polion has failed to establish that "but for" counsel's efforts he would not have been convicted.  *Strickland v. Washington, supra.*

(Exhibit D, p. 2).

In other words, the appellate court concluded that petitioner had failed to satisfy the prejudice prong.

The court further held:

Polion further claims his trial counsel, Brown and Higginbotham, were ineffective for failing to raise an ineffective assistance of counsel claim at trial against his pre-trial counsel in order to obtain an exclusion of his statements. (Appellant's brief at p.34).  In its order denying the appellant's motion for a new trial, the trial

9

> court found that Polion failed to establish ineffective
> assistance of trial counsel under [] *Strickland*. (CR. 520).
> Since the trial court found, and we agree, that Polion's
> pre-trial counsel was not ineffective, we can not hold his
> trial counsel ineffective for failing to raise a non-
> meritorious issue. See *Bedwell v. State*, 710 So.2d 493
> (Ala.Cr.App. 1997).

(Exhibit D, p. 3)

The trial court did not specifically address whether pre-trial counsel was ineffective when ruling

on the motion for new trial; however, in the pretrial order denying Polion's motions to enforce a deal or

stipulation and motion to suppress evidence, the trial court found that there was no basis for arguing that

the statements of February 5, 1996, February 6, 1996, and February 28, 1996 should be suppressed

because the statements preceded discussions between pre-trial counsel and the district attorney about a

potential deal. The court further held that the April 10, 1996 videotaped interview was not due to be

suppressed as involuntary because

> the Court does not find it to be established by the evidence
> that there was such an offer or agreement. Rather, the
> Court finds that any understanding by Mr. McKinney to
> that effect was simply the result of miscommunication and
> misinterpretation of the actual import of the statements
> made by Mr. Freeman and Mr. Smith.

(CR. 318-20).

It is this specific finding upon which Polion's habeas counsel bases his allegation of ineffective

assistance of counsel.

Polion argues that it was ineffective assistance of counsel for pre-trial counsel to suggest that

petitioner make a statement regardless of the reasons for his advice and that "any lawyer worth his salt

will tell the suspect in no uncertain terms to make no statement to police under any circumstances,"

quoting Justice Jackson in *Watts v. Indiana*, 338 U.S. 49, 59, 69 S.Ct. 1347, 93 L.Ed.1801 (1949). Polion

contends that McKinney's conduct in allowing the statement fell far below all acceptable standards, and that there is no doubt that the evidence that the State obtained impacted the outcome of the case.

When Justice Jackson opined that "any lawyer worth his salt will tell the suspect in no uncertain terms to make no statement to police under any circumstance," he did so not in the context of an opinion addressing the ineffective assistance of counsel but, rather, in the context of a concurring dissenting opinion in a case which involved the failure of the police to advise a suspect of his right to counsel. Justice Jackson stated:

> Amid much that is irrelevant or trivial one serious situation seems to me to stand out in these cases. The suspect neither had nor was advised of his right to get counsel. This presents a real dilemma in a free society. To subject one without counsel to questioning which may and is intended to convict him, is a real peril to individual freedom. To bring in a lawyer means a real peril to solution of the crime because, under our adversary system, he deems that his sole duty is to protect his client--guilty or innocent--and that in such a capacity he owes no duty whatever to help society solve its crime problem. Under this concept of criminal procedure, any lawyer worth his salt will tell the suspect in no uncertain terms to make no statement to police under any circumstances.

*Watts v. Indiana*, 338 U.S. 49, 59 (1949)(Justice Jackson, concurring/dissenting).

In protecting his client, sometimes a lawyer may often times best do so by advising his client to say nothing; however, there are also occasions when a lawyer in an effort to minimize the possible charge or sentence may best protect his client by recommending that the client cooperate with authorities in hopes of favorable treatment. The fact that counsel was found to have mistakenly concluded that there was a deal does not mean that counsel was ineffective if his mistaken belief was reasonable. The testimony at the evidentiary hearing on the pretrial motion to suppress stated counsel's basis for advising Polion to cooperate with authorities. Prior to making the April 10, 1996 statement, Polion's lawyer had

11

been told that they (the police and district attorney's office) felt that there was sufficient evidence to charge him with hindering prosecution. ( R. 71, 265-68, 300). McKinney testified:

MR. McKINNEY:   And I think Mr. Freeman stated that he felt that they had a strong case against Frederick for hindering prosecution and ... at that point they were going to, if they were able to get a conviction, recommend that he serve ten years in prison and that ... he would, of course, recommend that he be denied probation, and that he could help himself as far as that was concerned.... I think he stated that they wanted him to talk with homicide and give a statement as to everything that he knew about the situation, that they wanted him to testify at the preliminary hearing and whatever other proceedings there would be against Felicia Scott, and that as far as probation was concerned, he would have to submit to a polygraph.

(R. 71-72).

He further testified:

Q:   It was your understanding at that first meeting that the deal or agreement would have been for hindering prosecution?

A.   That was my understanding.   That was my understanding what his exposure would be.

(R. 73)

Q:   In essence, the offer was presented to him –

A:   Right.

Q:   – for hindering prosecution –

A:   Right.
Q:   – if he would cooperate with the investigators. And then he went out and made statements and subsequently went on up to Birmingham and helped locate this evidence?

A:   That's correct.

(R. 97).

Q:   In that first meeting – I am talking about the one before the polygraph – they specifically said we think we have a good case against your man on hindering prosecution –

A:    That's correct.

Q:    – we are interested in his cooperation, but nobody said we're going to settle this case on hindering prosecution now at this day, did they?

A:    Well, the reference was that his exposure would be only hindering prosecution.

Q:    They never said we are offering you hindering prosecution, did they?

A:    They never said they were going to settle it that day for hindering prosecution.

Q:    They never said they would settle it at any time for hindering prosecution, did they?  I'm talking about Mr. Freeman.

A.    Mr. Freeman did not.

(R. 102.  See also, R. 107-110).

Tommy Smith, an assistant district attorney, testified as to a meeting which included himself, Mr. McKinney, and Mr. Freeman:

Q:    When y'all got into the meeting, the best that you can recall describe who said what exactly including yourself, Mr. McKinney, and Mr. Freeman.

A:    At that time the investigation had been continuing, of course, for some time. Ms. Curry's body had been found, and a lot of information had come to us through the investigators. And we talked with Ricky or he with us concerning whether or not or what role his defendant might have as far as trying to help himself, what he was trying to do or to minimize his involvement. And we were – when I say "we," Mr. Freeman was and I was there – were very clear that if the defendant wanted to offer something or did something, that was strictly up to him and his attorney, but that anything that he did do, it would have to involve full and complete cooperation, that it would have to be truthful. He was told he would have to pass a polygraph test. And that was specifically said because we had a great deal of evidence at that time that pointed to him not only being involved in hindering prosecution but potentially or actually being involved in the murder itself. And it was clear that Mr. McKinney and Mr. Polion were working to try and minimize whatever they could as far as what Mr. Polion would be charged with or done, and we were very clear to make sure that no deals, no offers or no agreements were made as to any charges or any sentence whatsoever.

13

Q:   Did y'all specifically in any way, form or fashion make an offer or agreement to settle his cases based on his cooperation for hindering prosecution?

A:   Absolutely not.

Q:   Did y'all, however, indicate to him that if he did truthfully assist y'all, that that would help him?

A:   I think what we told him was it certainly couldn't hurt him and if you wanted to help himself, that was up to him.

(R. 152-53).

Q:   Did you ever, to your knowledge, tell him that you were willing to settle this case for anything other than what Mr. Freeman approved?

A:   No, sir. ... The only discussions that we ever had were that at the least Mr. Polion was looking at hindering prosecution and that it he was convicted, based on the information that we had at that particular time when these things were said, which is before the 10th, that we would ask for the maximum sentence, which was true.

(R. 156-57).

Based on the testimony at the pretrial hearing on the motion to suppress, it was not unreasonable for pretrial counsel to have misunderstood that the only charge potentially facing Polion was hindering prosecution and that Polion could help himself by truthfully cooperating and in advising Polion to do so.

Moreover, Polion has failed to identify any specific portion of the April 10 statement which would have been relevant to the kidnapping of the baby charge or any evidence relevant to the kidnapping the baby charge that was discovered as a result of the April 10 statement. It appears that all evidence found as a result of the April 10 statement would have been relevant to the kidnapping and murder charges pertaining to Curry rather than the baby.[2] Polion was acquitted of all charges involving

_____

[2]   The following evidence was found as a result of the April 10 statement: one spent .25 caliber shell casing, one brown paper bag with stains that appeared to be blood, one empty long neck Budweiser bottle, one high-risk pregnancy pamphlet with incision diagrams for Cesarean Delivery, one pair of white latex gloves, one 6 oz. Pinesol bottle, one white towel with stains, one black bag with maroon trim, one black shaving kit, one savings account book in the name of Frederick Polion, two Treet brand razor blade covers, one spool of black sewing

14

the murder and kidnapping of Curry and was convicted only of the charge involving the kidnapping of Curry's baby. Neither the trial nor the appellate court's application of *Strickland's* performance and prejudice prongs was objectively unreasonable with respect to this claim.

II.     **Trial counsel were ineffective for failing to request jury instructions**

    A.     Failure to request any jury instructions in capital murder case

Polion alleges that it was ineffective assistance of counsel for trial counsel to "fail[] to request any written or oral jury charges and fail[]to object to the jury charges given by the trial court [when] [t]he Petitioner was charged in this case with Capital Murder." (Petition, p.2, ¶ 12(b), sentences 1 and 2). Neither the trial nor appellate court specifically addressed this claim. It is also unnecessary for this court to address this claim in that Polion cannot demonstrate any prejudice from the alleged errors. He was not convicted of capital murder. Polion has also not alleged what instructions should have been given or what instructions were given that should not have been given beyond those identified in Sections IIB, IIC and IID considered below.

    B.     Failure to request charge on lesser included offense of second degree kidnapping

Polion alleges that counsel should have requested a charge on the lesser included offense of Second Degree Kidnapping and that "[i]t is reasonable to conclude that had the jury been given such a charge they could have found him guilty of Second Degree Kidnapping rather than First Degree Kidnapping." (Petition, p.2, ¶ 12(b)). He also argues that there was no evidence that the kidnapping of the baby was done with the intent to aid or accomplish the crime of interference with the custody of

---

thread with a needle, one disposable Schick brand safety razor, one black plastic garbage bag, one vehicle floor mat, two wash cloths with stains on them, Polion's Motorola pager, one wooden clothes pin, two Walmart plastic bags, miscellaneous brown paper bags, a black plastic bag with a wash cloth inside, and a Food King coupon. (R.1240-1254).

Curry or anyone else, and there would have been a tremendous advantage in requesting a Second Degree Kidnapping charge which would have a shorter maximum sentence.[3/]

Petitioner cites two cases for the proposition that courts have reversed convictions based on ineffective assistance of trial counsel in failing to request a jury charge on a lesser included offense. Neither of these cases supports petitioner's argument. *People v. Hoyte*, 183 Misc.2d 1, 701 N.Y.S.2d (N.Y. Sup. 1999), was reversed, 273 A.D.2d 48, 709 N.Y.S.2d 537 (N.Y.A.D. 1 Dept. 2000) and on remand, 185 Misc.2d 587, 591, 714 N.Y.S. 2d 420 (N.Y. Sup. 2000) the court held:

> Nor can counsel's strategic reason to forego requesting the submission of a lesser included offense be considered a failure to provide effective assistance of counsel. Again, while upon review it might have seemed more prudent to request the submission of a lesser included offense, the standard of review here is not a retrospective one, but rather one that compels a review of counsel's performance considered at the time of representation. A failure to request the submission of a lesser included offense as part of a strategic tactic is a choice often made by defense counsel and cannot be considered less than reasonable here.

In *Brightman v. State*, 336 S.C. 348, 520 S.E.2d 614 (S.C. 1999), trial counsel requested a lesser included offense charge and the request was granted. The court held that counsel was ineffective in failing to request a *King* charge, a charge that states that if a jury has a reasonable doubt between lesser and greater offenses, it must resolve the doubt in the defendant's favor.

---

[3/]   Kidnapping in the first degree is a Class A felony (13A-6-43(c)) punishable by a term of imprisonment "for life or not more than 99 years or less than 10 years" (13A-5-6(a)(1)) while kidnapping in the second degree is a Class B felony (13A-6-44(c)) punishable by a term of imprisonment for "not more than 20 years or less than 2 years." (13A-5-6(a)(2)). Petitioner was sentenced to twenty years which would be within the acceptable range for either a Class A or Class B felony.

The appellate court, relying on the trial court's order denying the motion for new trial, concluded that trial counsel was not ineffective for failing to request a jury instruction on kidnapping in the second degree and that Polion failed to show prejudice:

> Polion was convicted of abducting Curry's baby with intent to accomplish or aid in the commission of the felony interference with the custody of a child or the flight therefrom, See § 13A-6-43(a)(3), Ala. Code 1975. "A person commits the crime of kidnapping in the second degree if he abducts another person." § 13A-6-44(a), Ala. Code 1975.

> The trial court in its order denying Polion's motion for new trial stated with regard to this argument:

>> "Without undertaking herein to analyze individually each claimed occurrence of ineffective assistance of counsel, the Court will express its opinion that trial counsel's focus was properly directed toward obtaining a not guilty verdict as to the capital murder charge, the murder charge relating to Carethia Curry, and the kidnapping charge relating to her. It is understandable that reasonable and adequately functioning counsel might become so preoccupied with those most serious charges, that they could concentrate on them to the possible exclusion of full and complete attention to another charged offense, or a possibly available lesser-included offense. The undersigned certainly will have to acknowledge that he never envisioned that the jury might exonerate the Defendant as to all criminal offenses relating to Carethia Curry, and yet find him guilty of kidnapping her unnamed infant child. Accordingly, he can appreciate why trial counsel were focusing their attention and energies on the charges directly involving Carethia Curry. Also, forgoing the possibly available lesser-included offense of kidnapping in the second degree enhanced the Defendant's chance of being found not guilty across the board. An attorney could reasonably conclude that it was better to 'go for broke' as to capital murder, non-capital murder, and two counts of kidnapping, and not offer the jury a choice of the much easier to prove kidnapping in the second degree, which would expose the Defendant to a

possible 10-years sentence.  Under the Defendant's own testimony, the jury could easily have found him guilty of kidnapping in the second degree, by accepting his version that he first became aware of the presence of the baby when Felicia Scott arrived at his apartment with it, but conclude that he subsequently knew that it was not her and his child, but the child of Carethia Curry, and yet continued with activities that could satisfy the only element required for kidnapping in the second degree, that of abduction.  It was a reasonable defense 'game plan' not to request that the jury be provided with kidnapping in the second degree with respect to the infant child, given the relative ease with which that charge could be proved by the Defendant's own testimony, as construed in light of, or impeached by, the other evidence in the case."

(CR. 521-22).

The trial court's conclusions regarding Polion's trial counsel's defense strategy are supported by the following excerpt from Polion's trial counsel's closing argument:

"This is our last chance to stand before you and tell you that Fred Polion is not guilty of capital murder; that he's not guilty of kidnapping or any other thing.  Perhaps hindering prosecution?  Maybe.  Perhaps.  No other charge is he guilty of.  Why?  Reasonable doubt."

(R.1596).

The record, as well as the trial court's observations, clearly indicate that trial counsel's defense strategy was to place all blame for the murder and kidnappings on Scott.  At the hearing on the motion for new trial Polion's trial counsel indicated their decision on what [jury] charges to request or not request was based on their legal opinion as to whether those charges would apply to this particular case. (R.1844, R.1853).  In its order denying Polion's motion for new trial, the trial court specifically found foregoing an instruction on the lesser included offense of kidnapping in the second degree enhanced Polion's chance of being found not guilty. (CR.523).  In light of the extensiveness of the charges alleged against Polion and the fact that Polion was found not guilty of all but one charge, we find

18

> it difficult to say th[at] his trial strategy failed or that his trial counsel was ineffective for failing to request the lesser included charge of kidnapping in the second degree.
>
> Moreover, even if, assuming arguendo, trial counsel had requested a jury instruction for kidnapping in the second degree, and the jury found Polion guilty of same based on Polion's testimony, the trial court could have still sentenced him to a twenty year sentence and Polion would not bettered his situation.  Therefore, Polion has failed to establish that he was prejudiced by this decision, and consequently, that his trial counsel was ineffective.

(Exhibit D, pp.11-12).

Higginbotham did not recall whether there was any consideration of requesting a jury charge for kidnapping in the second degree (R.1821) and Brown testified that there was no consideration about requesting a charge for kidnapping in the second degree.  (R.1846).  It is clear that the lawyers' focus was in fact on the capital murder charges.  Higginbotham testified that they "were operating under different circumstances then" (R.1824) and that "we really weren't interested in kidnapping."  (R.1825). Both Higginbotham and Brown testified, however, that it is their normal procedure to consider the evidence in the particular case before requesting jury instruction and that they followed this normal procedure in this case.  (R.1844,1853).  Although the trial decisions of Polion's trial attorneys may not have been a deliberate tactical strategy, the course they followed after considering the evidence of this case "might have been reasonable."  *Crawford*, 311 F.3d at 1314.

Further, Polion's § 2254 argument that the jury "could have found him guilty of second degree kidnapping" and that had they done so he would have benefitted from the shorter possible sentence is a far cry from demonstrating that but for trial counsels' alleged error in not requesting a kidnapping in the second degree charge, the fact finder would have had reasonable doubts concerning Polion's guilt of kidnapping in the first degree.  Such an argument is speculative and assumes that the jury did not

19

follow the jury instructions presented with respect to the elements of kidnapping in the first degree. The

state court's application of *Strickland's* performance and prejudice prongs was not objectively

unreasonable.

C.     Failure to request instruction on mistake of fact based
       on Polion's belief that he was the father of the child
       that was the subject of the kidnapping conviction

In support of this claim, petitioner alleges:

> Petitioner testified and his counsel argued that he sincerely
> believed that he was the father of the child that was the
> subject of the kidnapping conviction. Mistake of fact is a
> complete defense to a charge in such a case. Ala. Code
> (1975) § 13A-2-6, *Kent v. State*, 661 So.2d 797 (Ala.
> Crim. App. 1995). It was not trial strategy to not request
> a charge covering mistake of fact. Because the charge was
> not given, the jury would have been compelled to convict
> Polion even if they thought he honestly and sincerely
> believed that the child was his.

(Petition, p. 2, ¶ b).

This claim will be addressed in conjunction with Claim II.D.

D.     Failure to request  instruction on parental control
       defense to the charge of interference with custody

Petitioner argues that because intent to commit interference with custody was an element of the

offense for which he was convicted, trial counsel was ineffective in failing to request a jury charge on

the parental control defense to the offense of interference with custody. Alabama Code (1975) § 13A-6-

45(b). He further argues that if a person who intends to assume lawful parental control cannot be guilty

of interference with custody, parental control must also be a defense to a first degree kidnapping charge

based on intent to interfere with custody.

The appellate court held:

> Polion argues that his trial counsel was ineffective for failing to request a jury charge on mistake of fact and the lawful exertion of parental control because Polion testified that he believed he was the father of the baby. The trial court, however, when it charged the jury on kidnapping in the first degree and interference of the custody of a child instructed the jury that it could not find Polion guilty of either of these offenses without determining that Polion either abducted the child or knowingly interfered with the custody of the child. The jury by its finding Polion guilty of kidnapping in the first degree, rejected Polion's defense that he believed he was the father of the baby. Therefore, although these defenses were not explicitly provided to the jury, the jury inferred the defenses from the instructions provided by the trial court. Consequently, Polion has failed to show that his trial counsel was ineffective for failing to request these instructions.

(R.1653-61).

The trial court, in instructing petitioner on kidnapping in the first degree, repeatedly reminded the jury of the necessity that the state prove intent. The testimony of petitioner that he believed the baby was his could have been considered by the jury in determining whether he had the requisite intent to interfere with custody even without an instruction related to mistake of fact and parental control. In any event, the state court's application of *Strickland*'s performance prong with respect to these issues was not objectively unreasonable.

**III.   Ineffective assistance of trial counsel by failing to object to the sufficiency of the indictment on the basis that it failed to advise petitioner of identity of the intended victim of the crime of interference with custody.**

Petitioner argues that the indictment does not advise petitioner whether the intended victim of the crime of interference with custody was Curry or her baby. He argues

> [Petitioner's] trial counsel thought that the charge was that Petitioner intended to interfere with custody of Carethia

21

Cur[r]y.   Because the jury acquitted Petitioner of murdering Cur[r]y, it is difficult to imagine how the evidence would have supported a conviction for kidnapping the baby with intent to interfere with the mother's custody.  In all likelihood, the jury felt that the interference with custody charge related to the baby.  This raised further problems because the interference with custody was used to "enhance" kidnapping to first degree kidnapping, even though in the case where the victim of both crimes was identical it would result in splitting an identical crime into two separate charges and then using one charge to "enhance" the other to a  more serious crime.  Also, not knowing what "intent the prosecution was attempting to prove, petitioner's attorneys could not know how to and did not challenge the prosecution's evidence.

(Petition, p.3 ¶ c).

The Alabama Court of Criminal Appeals held:

Polion further maintains that his trial counsel was ineffective for failing to object to the indictment. Accordingly to Polion, his defense was prejudiced because the indictment does not disclose whose custody he was charged with interfering as an element of the crime of kidnapping in the first degree.  (Appellant's brief at 50).

Count two of the indictment reads as follows:
        The Grand Jury of said County charge that before the finding of this Indictment, Frederick Polion, alias Fred Polion, whose name if otherwise unknown to the Grand Jury, did intentionally cause the death of Carethia Curry, by shooting her with a gun, and said defendant caused said death during said defendant's abduction of, or attempt to abduct the unnamed infant child of Carethia Curry, with intent to inflict physical injury upon her and/or to accomplish or aid the commission of any felony, or flight therefrom, to-wit:  Interference with custody in violation of Section 13A-6-45 of the Code of Alabama, in violation of Section 13A-5-40(a)(1) of the Code of Alabama.

(CR. 15).

22

Polion was convicted of the lesser-included offense of kidnapping in the first degree. An indictment need not separately allege any offense that is a lesser included offense of the offense charged. *Sellers v. State*, 624 So.2d 686 (Ala. Cr. App. 1993). "An indictment which follows the language of a statute is sufficient to apprise the [defendant] of the charges against him and to allow him to prepare a defense." *State v. Franklin*, 541 So.2d 593, 595 (Ala. Cr. App. 1989). Reading the indictment as a whole, we find a reasonable person would have sufficient information to understand the nature of the offense and be able to prepare a defense. See *Chambers v. State*, 364 So.2d 416 (Ala. Cr. App. 1978). Therefore, Polion's trial counsel was not ineffective for failing to raise this non-meritorious claim.

(Exhibit D. pp.13-14).

Section 13A-6-43(a)(3) states:

A person commits the crime of kidnapping in the first degree if he abducts another person with intent to accomplish or aid the commission of any felony or flight therefrom.

Section 13A-6-45(a)(1) states:

A person commits the crime of interference with custody if he knowingly takes or entices any child under the age of 18 from the lawful custody of its parent, guardian or other lawful custodian.

(Exhibit D. p.13).

The statutes clearly indicate that the victim in a kidnapping would be the person kidnapped while the victim in an interference with custody would be the kidnapped child's parent, guardian or other lawful custodian.[4] The kidnapping victim in count I was Curry and the victim of the interference with

---

[4]     Although the Alabama courts have not explicitly addressed who is the victim with respect to interference with custody, Georgia has. In *Stroud v. State*, 200 Ga. App. 387, 390, 408 S.E.2d 175, 178 (1991), the court held:
              The offenses [kidnapping and interference with custody] differ in the classification
              of the victim which each statute seeks to protect – the person abducted and held

23

custody was Curry's parent, guardian or other lawful custodian whereas the kidnapping victim in count II was the baby and the victim of the interference with custody was Curry, the baby's father, guardian or other lawful custodian. The appellate court's application of *Strickland's* performance prong to this issue was not objectively unreasonable.

Based upon the foregoing the court concludes that the petition for writ of habeas corpus is due to be denied. A separate Final Judgment consistent with this memorandum of opinion will be entered simultaneously herewith.

DONE this the ___22nd___ day of September, 2003.


                                        *Sharon Lovelace Blackburn*
                                        SHARON LOVELACE BLACKBURN
                                        UNITED STATES DISTRICT JUDGE

---

against his will in the case of kidnapping, and the lawful custodian whose custody
has been interfered with in the case of interference with custody.
See also, *State v. Evans*, 212 Ga .App. 415, 442 S.E.2d 287 (1994).